# Illinois Official Reports

## Appellate Court

---

### *Rohr Burg Motors, Inc. v. Kulbarsh*, 2014 IL App (1st) 131664

---

| | |
|---|---|
| Appellate Court Caption | ROHR BURG MOTORS, INC., d/b/a Bob Rohrman's Schaumburg Ford, Plaintiff and Counterdefendant-Appellee, v. BRUCE KULBARSH, Defendant and Counterplaintiff-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-13-1664 |
| Filed | August 25, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from defendant's purchase of a used car from plaintiff dealership that had been involved in a major accident, contrary to plaintiff's representations, the trial court's order entering summary judgment dismissing defendant's counterclaims against plaintiff and his affirmative defenses to plaintiff's complaint was affirmed, since the record showed that upon the discovery of the problem with the car defendant purchased, the parties entered into a release agreement under which plaintiff agreed to refund defendant's money, pay off the loan he obtained to pay the balance of the purchase price, and basically make defendant whole and defendant agreed to return the vehicle, and despite several problems in connection with checks tendered by plaintiff and defendant's temporary refusal to return the vehicle, the parties' agreement was ultimately performed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-M3-3963; the Hon. Sandra Tristano, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Law Office of Sheila A. Genson, Ltd., of Schaumburg, (S.A. Genson, of counsel), and Zane D. Smith & Associates, of Chicago (Zane D. Smith, of counsel), for appellant. |
|---|---|
| | William G. Hutul, P.C., of Carol Stream (William G. Hutul, of counsel), for appellee. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion. Justices Hoffman and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant and counterplaintiff-appellant Bruce Kulbarsh (Kulbarsh) appeals from the trial court's order of April 17, 2013, granting summary judgment dismissing his counterclaims against plaintiff and counterdefendant-appellee Rohr Burg Motors, Inc., d/b/a Bob Rohrman's Schaumburg Ford (Rohr Burg), and dismissing Kulbarsh's first four affirmative defenses to Rohr Burg's complaint against him. Kulbarsh argues that: (1) the trial court erred in finding that Kulbarsh's counterclaims were barred by operation of a release contained in a written agreement between the parties; and (2) the affirmative defenses were not subject to summary judgment.

¶ 2                                    BACKGROUND

¶ 3    This appeal arises from a dispute between the buyer of an allegedly damaged used car and the dealership that sold him the vehicle. In July 2010, Kulbarsh visited a car dealership in Schaumburg, Illinois, known as Bob Rohrman's Schaumburg Ford (Schaumburg Ford), which is operated by Rohr Burg. According to Kulbarsh, he spoke to sales personnel at Schaumburg Ford and expressly communicated that he only wished to purchase a vehicle without any history of collisions. Sales personnel at Schaumburg Ford showed Kulbarsh a 2010 Ford Mustang convertible (the vehicle). Interested in the vehicle, Kulbarsh requested that the dealership show him the corresponding vehicle history reports. Kulbarsh was provided a report issued by CarFax dated June 25, 2010. The CarFax report indicated that the vehicle had originally been purchased in May 2009 and stated there were "[n]o accidents or damage reported to CarFax." Kulbarsh asked sales personnel to show him an AutoCheck vehicle history report, but he was told such a report was not available.

¶ 4    Kulbarsh agreed to purchase the vehicle for the price of $19,600 and entered into a sales contract dated July 6, 2010.[1] Kulbarsh tendered a down payment of $4,000. The remainder of the purchase price was financed through a loan from American Eagle Bank, which is not a party to this action.

---

[1]The sales contract states that the vehicle was being "[s]old as is, with all faults." Kulbarsh signed below the accompanying statement: "I hereby make this purchase knowingly without any guarantee, expressed or implied, by this dealer or his agent."

¶ 5    In September 2010, approximately two months after purchasing the vehicle, Kulbarsh developed new concerns about the vehicle's history. He brought the vehicle to another car dealership where he had previously purchased vehicles. Employees at that dealership examined the vehicle and told Kulbarsh their suspicion that the vehicle had sustained prior damage. An employee of that dealership obtained an AutoCheck report for the vehicle, which indicated that the vehicle had frame damage due to a "major accident."

¶ 6    On September 3, 2010, Kulbarsh retained an attorney, Andy Norman, in order to seek a rescission of the purchase of the vehicle from Schaumburg Ford. Kulbarsh returned to the dealership and complained that he had been sold a damaged car. After discussing his complaint with the Schaumburg Ford salesperson who had sold him the vehicle, an agreement was reached under which Kulbarsh would return the car and the dealership would refund the purchase price as well as pay off the American Eagle Bank loan. This arrangement was reflected in a letter to Kulbarsh from Rohr Burg dated September 8, 2010 that acknowledged Kulbarsh's concern regarding "a possible frame damage incident that your vehicle may have sustained" and offered: "If you are not completely satisfied please return the vehicle to Schaumburg Ford for a full refund including the interest that you have paid since the time of purchase."

¶ 7    The following day, September 9, 2010,[2] Kulbarsh and Rohr Burg executed a document entitled "General Release." Kulbarsh testified that he was advised by his legal counsel at the time he signed the document. The General Release provides:

> "I, Bruce D. Kulbarsh *** in reference to the purchase of a 2010 Ford Mustang *** on July 6, 2010, do hereby accept $21802.00, the repurchase amount and rescission of the contract, due to my concerns associated with the fact of a possible frame damage reported on an Autocheck Report of said vehicle. It is also understood that I, Bruce D. Kulbarsh do hereby acknowledge, remise, release, and forever discharge Rohr-burg Motors Inc. DBA Bob Rohrman Schaumburg Ford *** from any and all obligations of any kind and nature that I may have against said Rohr-burg Motors Inc. *** and any and all other related, parent and/or subsidiary corporations if any because of anything done or omitted to be done by them from the beginning of the world to date hereof. It is hereby agreed by both parties that said vehicle has been returned in the same condition for which it was purchased. The Undersigned intends hereby to release all unknown and unanticipated claims, if any. In signing this release, the undersigned does not rely upon any representations made by any persons or party or Agent or the Agent of any person or party hereby released."

The document was signed by Kulbarsh as well as by Mike Sabzali, a general manager at Schaumburg Ford. Following the language noted above, the General Release contains handwritten language certifying that American Eagle Bank had confirmed to Sabzali that the "payoff figure" for the loan on the vehicle was $17,731.45, and that "Schaumburg Ford insures full and complete payoff of the indebtedness" to American Eagle Bank.

¶ 8    According to Kulbarsh, after executing the General Release on September 9, 2010, Sabzali showed him a check made out to Kulbarsh for the refund of his down payment. However,

---

[2]The typewritten date recited in the General Release is September 8, 2010; however, the notary's signature indicates the document was executed on September 9, 2010, and Kulbarsh's deposition testimony confirmed that the document was signed on September 9, 2010.

Sabzali told him that Schaumburg Ford "need[ed] two signatures to deposit" the check and that Sabzali needed to obtain another signature on the check before it would be valid. Sabzali thus asked Kulbarsh to come back to the dealership the next day and "they would have the check ready" for Kulbarsh. Kulbarsh maintained possession of the vehicle pending receipt of the check.

¶ 9    Kulbarsh returned with the vehicle to the dealership the next day, September 10, 2010, and was given a check in the amount of $4,325.75. After receiving the check, Kulbarsh took off the license plates from the vehicle and left it at Schaumburg Ford. Later on the same date, Kulbarsh brought the check to a Chase bank where he had an account and attempted to deposit it. However, the bank told Kulbarsh the check could not be deposited, as it was "NSF" due to insufficient funds. After the check was declined Kulbarsh called Schaumburg Ford, and another salesperson from the dealership (whose name Kulbarsh could not recall) met him at the Chase bank. According to Kulbarsh, after the bank told the Schaumburg Ford salesperson that the check was declined as "NSF," the salesperson agreed to give Kulbarsh the vehicle back. Kulbarsh and the salesperson returned to the dealership, where Kulbarsh put his license plates back on the vehicle and drove the vehicle home.

¶ 10   Kulbarsh returned to the same Chase bank "the next day or so" to inquire about the check. At that second visit, the check cleared and the full amount of $4,325.75 was deposited into Kulbarsh's account. Thus, within a few days after signing the General Release, Kulbarsh received the refund of his down payment on the vehicle. However, Kulbarsh did not return the vehicle after this check was deposited.

¶ 11   With respect to the repayment of the car loan contemplated by the General Release, American Eagle Bank sent Kulbarsh a letter dated September 13, 2010, which stated: "Please accept this letter as proof that American Eagle Bank has received a payoff from Schaumburg Ford on your account *** in the amount of $17,731.45. Your account will be closed as of today, and your paid papers will be sent to you in 21 days." Despite receiving this letter, Kulbarsh doubted that American Eagle Bank had been paid off by Schaumburg Ford, as he did not know "if the check was any good" or "if the check ever went through." Kulbarsh acknowledged at his deposition that he later spoke to personnel at American Eagle Bank, who told him the check had been deposited, but Kulbarsh maintained that the bank "couldn't verify that it was actually paid off in full," because he believed the check "could still come back bad at any time."

¶ 12   Kulbarsh did not return the vehicle even after depositing the $4,325.75 check refunding his down payment and after receiving the letter from American Eagle Bank confirming payoff of the car loan. In a letter dated September 30, 2010, Rohr Burg demanded that Kulbarsh return the vehicle. The letter to Kulbarsh, signed by Mark J. Battista as director of the Bob Rohrman Auto Group, stated that "you have failed to return the above mentioned vehicle associated with the agreement both written and verbally. Please accept this as our formal demand for the return of our property the 2010 Ford Mustang due to the fact that you are in breach of our agreement." Kulbarsh did not return the vehicle.

¶ 13   On October 22, 2010, Battista, who is not an attorney, filed a complaint on behalf of Rohr Burg in the municipal department of the circuit court of Cook County. The complaint named both Kulbarsh and his attorney, Andy Norman, as defendants. Battista filled out a "*Pro Se* Complaint" form provided by the court and attached a separate document titled "Complaint" detailing the history of Kulbarsh's purchase, the execution of the General Release, and the

parties' subsequent communications. The complaint alleged that Kulbarsh had wrongfully retained the vehicle despite Rohr Burg's refund of Kulbarsh's down payment and payment of the American Eagle Bank loan. The complaint made no mention of any check to Kulbarsh being declined due to nonsufficient funds, but rather alleged that Kulbarsh "immediately cashed the Schaumburg Ford check and retains the money he paid for the car which was returned to him." The complaint alleged that Kulbarsh committed "a conversion of [Rohr Burg] property." The complaint "demand[ed] damages for breach of agreement, conversion, [and] trespass to chattel, as the vehicle is being diminished in value" and Kulbarsh was "being unjustly enriched by using a car he has not paid for."

¶ 14    On November 12, 2010, Kulbarsh filed a handwritten *pro se* answer to Rohr Burg's complaint claiming he had been "defrauded by Schaumburg Ford/Rohr Burg Motors into buying a car that they knew had major unibody damage and was unsafe to drive." The answer claimed that "[w]hen [Rohr Burg] offered to buy the car back, *** the check they gave me was N.S.F. [nonsufficient funds] as was the payoff check on the loan." Kulbarsh's answer acknowledged "[t]hey have since covered the first check, but have refused to verify the loan payoff check," adding that "[w]e are holding the car until then."

¶ 15    According to Kulbarsh, when the parties first appeared in court on November 15, 2010, the trial court directed Kulbarsh to return the vehicle.[3] Later that day Kulbarsh and his mother took the vehicle and met with Sabzali and Battista at another car dealership, a Kia dealership, also operated by Rohr Burg. According to Kulbarsh, Sabzali demanded an additional $3,000 from Kulbarsh in addition to return of the vehicle. Kulbarsh refused to pay this amount but left the vehicle at the Kia dealership.[4]

¶ 16    Rohr Burg retained counsel, Frank Savaiano of the law firm Savaiano & Spear. On January 11, 2011, Andy Norman, the attorney who had represented Kulbarsh with respect to the General Release, moved to dismiss the complaint's allegations against him. By consent of the parties, the case was dismissed as to Norman on March 9, 2011.

¶ 17    Kulbarsh, again acting *pro se*, filed a verified answer on April 29, 2011 in which he stated that Rohr Burg had been in possession of the vehicle "since January 2011." On May 19, 2011, Kulbarsh filed counterclaims against Rohr Burg asserting breach of contract, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1-12 (West 2010)), and intentional infliction of emotional distress, as well as affirmative defenses of fraud, mistake and unclean hands. The counterclaims alleged, among other things, that the parties' agreement to refund the purchase price in exchange for return of the vehicle was breached because the "refund check" given to Kulbarsh was "invalid." On June 16, 2011, Rohr Burg, through its counsel, moved to strike Kulbarsh's affirmative defenses and

_____

[3]The record on appeal contains a motion call order dated November 15, 2010 setting a briefing schedule, but does not indicate whether the trial court instructed Kulbarsh to return the vehicle at that time. At oral argument on its motion for summary judgment, Rohr Burg's counsel asserted that the car was not returned until a later date.

[4]The parties dispute whether Kulbarsh told Rohr Burg that he was leaving the vehicle at the Kia dealership. Kulbarsh claims to have informed the dealership's manager prior to leaving the vehicle. Rohr Burg claims that Kulbarsh did not inform dealership personnel about the origin of the car and thus it was towed away as an abandoned vehicle. However, that factual dispute is immaterial to the merits of this appeal.

counterclaims. On July 20, 2011, Kulbarsh's response to that motion requested leave to amend his pleading, which was granted.

¶ 18    Kulbarsh retained counsel, who appeared in the action on August 2, 2011. On September 28, 2011, Kulbarsh filed amended counterclaims and affirmative defenses. The first two affirmative defenses, fraud and misrepresentation, alleged that Rohr Burg knowingly "misrepresented a material fact in that it stated it was giving [Kulbarsh] a check that was negotiable" when "Rohr Burg knew there were not enough funds in the account for the check to clear." The third affirmative defense alleged that "Rohr Burg breached the written contract" in the General Release "by failing to give [Kulbarsh] a check that was negotiable," and that Rohr Burg "voided" the contract by "giving the Vehicle back" to Kulbarsh.

¶ 19    The fourth affirmative defense states: "Upon the title being sent to Rohr Burg and the money being refunded, [Kulbarsh] returned the vehicle." In that defense, Kulbarsh acknowledged that he had received his refund of the purchase price and that Rohr Burg had paid off the car loan: "After the written contract was voided, Rohr Burg again submitted two checks. These checks cleared; that is, [Kulbarsh's] loan to the bank had been repaid, and the Rohr Burg check made payable to [Kulbarsh] for the funds that he had used to buy the vehicle had cleared. The title to the vehicle was sent by the Bank to Rohr Burg, and thereafter [Kulbarsh] *** returned the vehicle."

¶ 20    In the same pleading, Kulbarsh asserted three counterclaims: breach of contract, fraud, and violation of the Consumer Fraud Act. Each of these counterclaims was based on allegations that Schaumburg Ford had concealed or made misrepresentations to Kulbarsh concerning the vehicle's prior collision damage at the time of his July 2010 purchase.

¶ 21    Rohr Burg filed a motion to strike and dismiss Kulbarsh's affirmative defenses and counterclaims on October 18, 2011. With respect to the counterclaims, Rohr Burg's primary argument was that the General Release barred any claims related to the purchase of the vehicle. Rohr Burg's motion to dismiss further noted that Kulbarsh's fourth affirmative defense admitted that Kulbarsh had received "the funds called for by the General Release."

¶ 22    As to Kulbarsh's affirmative defenses, Rohr Burg argued that the defenses of fraud and misrepresentation "do[ ] not defeat any of the claims set forth in [Rohr Burg's] complaint, but rather seek to reduce the amount that may be recovered." The motion again noted that Kulbarsh's "fourth affirmative defense make[s] it clear that all payments called for in the General Release were in fact made," and that Kulbarsh had "admitted *** that he had in fact received the funds in relation to the check that [Kulbarsh] is alleging constituted fraud." Rohr Burg argued that the third affirmative defense, which was also premised on the initially dishonored check, should fail for the same reason. With respect to the fourth affirmative defense–that Kulbarsh had returned the vehicle after receiving the refund checks–Rohr Burg argued that this was "merely a denial of the allegation contained in [Rohr Burg's] complaint" and was not a valid affirmative defense.

¶ 23    In response, Kulbarsh's brief to the trial court argued that his first three affirmative defenses were appropriate as defenses to enforcement of the contract in the General Release. With respect to the fourth affirmative defense, Kulbarsh's brief stated: "The Affirmative Defense is that upon entering into an agreement, Rohr Burg Motors failed to comply with its terms by failing to give [Kulbarsh] a negotiable check. Rohr Burg Motors then gave the Vehicle back to [Kulbarsh]. As such, there was no written agreement anymore. However, there

was an oral agreement that the Parties entered into. That is, when Rohr Burg Motors gave [Kulbarsh] a negotiable check that cleared, the Vehicle was returned."

¶ 24    Rohr Burg's reply argued that "[e]ven if the alleged delay in obtaining the funds" due to a nonnegotiable check "did make the agreement voidable, [Rohr Burg's] payment of all funds called for *** and [Kulbarsh's] acceptance of said funds establishes that the agreement was not in fact voided in this case." Rohr Burg argued that Kulbarsh's fourth affirmative defense "establish[ed] that [Rohr Burg] did abide by the terms and conditions of the agreement," since that affirmative defense "admits that the checks [Kulbarsh] received from [Rohr Burg] cleared and that the loan on the vehicle was satisfied." Rohr Burg's reply also reiterated its argument that all of the counterclaims were waived by the General Release.

¶ 25    On January 11, 2012, the trial court denied Rohr Burg's motion to strike Kulbarsh's amended affirmative defenses and amended counterclaims. The parties conducted discovery, and Kulbarsh was deposed on October 28, 2012. On January 22, 2013, Rohr Burg moved for summary judgment with respect to Kulbarsh's counterclaims and the first four affirmative defenses, again arguing that they were barred by the General Release. Rohr Burg noted Kulbarsh's deposition testimony that he had received the payment called for by the General Release. Rohr Burg's motion attached as exhibits the American Eagle Bank letter acknowledging payoff of the loan, copies of the checks from Rohr Burg to Kulbarsh and American Eagle Bank, and an affidavit from Schaumburg Ford's comptroller attesting that "no check has ever been returned for insufficient funds" or had not been fully negotiable at the time that it was written.

¶ 26    Rohr Burg's summary judgment motion further argued that, even assuming that the check to Kulbarsh had initially been denied as nonnegotiable, "the agreement would have been at best voidable by Kulbarsh." However, instead of voiding it, Kulbarsh "reaffirmed the agreement when he subsequently cashed the check and retained the funds relating thereto." Moreover, as each of the first four affirmative defenses concerned the alleged failure to provide a negotiable check, Kulbarsh's "admi[ssion] that he received the funds that he had been promised and that the bank had been paid" demonstrated that Rohr Burg "fully performed under the terms of the release [and] Kulbarsh's claims in relation thereto must be rejected."

¶ 27    Kulbarsh's opposition to the summary judgment motion attacked the validity of the General Release. First, Kulbarsh claimed that he received no consideration in exchange for his agreement to release any claims. Although the General Release stated that Kulbarsh agreed to accept "the repurchase amount and rescission of the contract," Kulbarsh argued that this was consideration only for his agreement to return the vehicle, not for his release of claims.

¶ 28    Kulbarsh alternatively argued that if the release was valid with respect to Kulbarsh, it should also be read to preclude Rohr Burg from asserting any claims against Kulbarsh. Kulbarsh relied on the General Release's language that "[t]he Undersigned intends her[e]by to release all unknown and unanticipated claims." Kulbarsh argued that since a representative of Rohr Burg had also signed the General Release, Rohr Burg was also the "undersigned" and thus the release provision applied against Rohr Burg to prevent it from asserting claims against Kulbarsh.

¶ 29    Kulbarsh separately argued that the release was "voided" and any obligations of Kulbarsh were "extinguished" when Rohr Burg breached the agreement by giving him a nonnegotiable check. According to Kulbarsh, Rohr Burg had acknowledged that the General Release had been voided when its salesperson gave Kulbarsh a ride from the Chase bank back to the

dealership and allowed Kulbarsh to leave the dealership with the vehicle. Kulbarsh contended that by the parties' conduct, "any obligations that the Parties had under the 'General Release' no longer existed" and any subsequent conduct involving the vehicle was based on oral agreement.

¶ 30    Rohr Burg's reply argued that the $21,802 cited in the General Release and rescission of the initial purchase contract constituted consideration supporting Kulbarsh's release of claims. Rohr Burg noted that the General Release specifically referred to Kulbarsh's "concerns associated with the fact of a possible frame damage" to the vehicle, indicating the General Release expressly contemplated claims related to the condition of the vehicle. Rohr Burg also disputed Kulbarsh's contention that the release could be construed to bar Rohr Burg's lawsuit. With respect to the argument that the parties had treated the release as null and void, Rohr Burg denied that it had issued any bad checks but noted that Kulbarsh admitted he eventually cashed the refund check. Rohr Burg thus argued that, even assuming its check was initially nonnegotiable, "by cashing the checks and retaining the funds Kulbarsh reaffirmed the release."

¶ 31    On April 17, 2013, the trial court heard oral argument on Rohr Burg's motion for summary judgment. Kulbarsh's counsel argued the release language was unenforceable due to lack of consideration because the payment to Kulbarsh called for by the General Release was only consideration for the return of the vehicle. The trial court rejected this argument and found that there was consideration supporting the release: "There are obligations of both sides here *** it is an exchange for value. You get the car back, *** and the other side gets the money back." The court also rejected the argument that the release could operate to bar Rohr Burg from suing Kulbarsh to enforce the agreement, recognizing that "[y]ou can sue on a release." The trial court explained that since Kulbarsh did not return the vehicle as called for by the agreement, "the plaintiff here, the dealership, had to sue on the obligations contained in this contract, which is a release."

¶ 32    Kulbarsh's counsel alternatively argued that even if the release was a valid contract, "[Rohr Burg] breached the contract by giving [Kulbarsh] a bad check." As the parties disputed whether a nonnegotiable check had ever been issued, Kulbarsh's counsel argued this constituted an issue of fact precluding summary judgment. However, as Kulbarsh did not dispute that he subsequently received the funds, the court found that whether the check was initially declined did not present a material issue of fact: "[F]rankly, I don't think that there is an issue of fact as to whether this check was NSF. This is a major car dealer, a check given on a major car dealer's account that did clear within the week." The trial court concluded "that there is no issue of fact that would defeat summary judgment" on Kulbarsh's counterclaims and first four affirmative defenses.

¶ 33    After the ruling, Kulbarsh's counsel asked the trial court: "How can you have a motion for summary judgment on affirmative defenses?" The trial court responded: "The affirmative defenses do not relate to the underlying case here which is violation or breach of the waiver agreement, the agreement that this lawsuit is based on. Defendant waived these claims, plain and simple. *** He got money, he did not return the vehicle." After stating its ruling, the trial court also granted Kulbarsh's counsel's request for "[Rule] 304(a) language" in the order. The written order of April 17, 2013 thus states: "Pursuant to Supreme Court Rule 304(a) this matter is final and appealable." Kulbarsh filed a timely notice of appeal on May 16, 2013.

¶ 34                                    ANALYSIS

¶ 35          At the outset, we address the argument set forth in Rohr Burg's appellate brief which asserts a lack of jurisdiction by this court because the trial court's order did not make a sufficient, express written finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). That rule provides: "If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). That rule is implicated here, since Rohr Burg's complaint remained pending notwithstanding the order granting summary judgment with respect to Kulbarsh's counterclaims and affirmative defenses. While Rohr Burg acknowledges that the trial court's summary judgment order cited Rule 304(a) and found the order "final and appealable," Rohr Burg argues that this is insufficient because "the order does not make an express written finding of both enforceability and appealability." Rohr Burg claims that "because the judgment does not follow the strict language of the rule, this appeal must be dismissed for lack of jurisdiction."

¶ 36          We disagree with Rohr Burg's argument and find that the trial court's order invoked appellate jurisdiction through its explicit reference to Rule 304(a). We recognize that jurisdiction is not automatically triggered where a trial court's order is "accompanied by language indicating that it is 'final and appealable,' but not referencing immediate appeal, the justness of delay, or Rule 304(a)." *Palmolive Tower Condominiums, LLC v. Simon*, 409 Ill. App. 3d 539, 544 (2011). In the *Palmolive* decision, we explained that "[a] circuit court's declaration that an order is 'final and appealable,' without reference to the justness of delay, or even reference to immediate appealability, evinces no application of the discretion Rule 304(a) contemplates. [Citation.] Instead, absent some other indication from the record that the court intended to invoke Rule 304(a) [citation], a circuit court's declaration that an order is 'final and appealable' amounts to nothing more than a nonbinding interpretation." *Id.* at 544.

¶ 37          Although the trial court in this case used the phrase "final and appealable" without additional language regarding the justness of delaying either enforcement or appealability, the trial court explicitly referenced Rule 304(a) in its written order. Moreover, the transcript of proceedings from the hearing on Rohr Burg's summary judgment motion reflects that the trial court specifically agreed to counsel's request for "[Rule] 304(a) language" in the order for the purpose of appeal. Thus, unlike the situation in *Palmolive*, where the phrase "final and appealable" was not accompanied by any reference to the rule, here it is apparent from the record that the trial court specifically intended to exercise its discretion pursuant to Rule 304(a). As we stated in *Palmolive*, "[o]ur supreme court does not require that a circuit court parrot Rule 304(a) exactly in order to invoke it." *Palmolive*, 409 Ill. App. 3d at 543 (citing *In re Application of the Du Page County Collector*, 152 Ill. 2d 545 (1992)). Indeed, we have previously held that we had jurisdiction on appeal from a trial court order stating that it was "final [and] appealable pursuant to Supreme Court Rule 304(a)" without additional express findings. (Internal quotation marks omitted.) *Abrams v. City of Chicago*, 338 Ill. App. 3d 179, 184 (2003), *rev'd on other grounds*, 211 Ill. 2d 251 (2004). Accordingly, we conclude that the trial court's order in this case, which explicitly references Rule 304(a), is sufficient for us to hear this appeal.

¶ 38    Next, we address Kulbarsh's contention on appeal that since Rohr Burg's complaint was not filed by an attorney, the complaint and all subsequent orders of the trial court must be deemed void. Kulbarsh argues that "even after Rohr-Burg hired an attorney, orders that followed were void due to the inability to resurrect the null and void Complaint."

¶ 39    The so-called "nullity rule," under which a complaint filed by a nonattorney on behalf of a corporation nullifies subsequent proceedings, was thoroughly examined by our supreme court in *Downtown Disposal Services, Inc. v. City of Chicago*, 2012 IL 112040. That decision recognized that "[c]ourts in this country, including this court, unanimously agree that a corporation must be represented by counsel in legal proceedings" but noted courts' "disagree[ment] on the consequences the lack of representation has on actions taken by nonlawyers on behalf of a corporation." *Id.* ¶ 22. The supreme court recognized that our appellate decisions had previously "held that such actions are a nullity and warrant dismissal, the entry of a default judgment against the corporation, or vacatur of any judgment rendered." *Id.* However, the supreme court noted that "[o]ther jurisdictions take the approach that actions by nonattorneys on behalf of a corporation are curable defects, allowing the corporation a reasonable time to obtain counsel and make any necessary amendments." *Id.* ¶ 23.

¶ 40    The *Downtown Disposal* decision declined to take the view that "any unauthorized practice of law by a nonattorney is a nullity." *Id.* ¶ 24. Instead, the supreme court held that "a *per se* nullity rule is unreasonable and that sanctions for violating the rule against the unauthorized practice of law 'should be proportioned to the gravity of the violation's consequences.' " *Id.* ¶ 30 (quoting *In re IFC Credit Corp.*, 663 F.3d 315, 321 (7th Cir. 2011)). Our supreme court further held that "because the consequences of applying the nullity rule to a case can be harsh, it should be invoked only where it fulfills the purposes of protecting both the public and the integrity of the court system from the actions of the unlicensed, and where no other alternative remedy is possible." *Id.* The *Downtown Disposal* decision instructed that courts consider a number of factors in deciding the consequences of actions by a nonattorney on behalf of a corporation:

    "The circuit court should consider, *inter alia*, whether the nonattorney's conduct is done without knowledge that the action was improper, whether the corporation acted diligently in correcting the mistake by obtaining counsel, whether the nonattorney's participation is minimal, and whether the participation results in prejudice to the opposing party. [Citations.] The circuit court may properly dismiss an action where the nonlawyer's participation on behalf of the corporation is substantial, or the corporation does not take prompt action to correct the defect." *Id.* ¶ 31.

¶ 41    Applying these principles to the facts of *Downtown Disposal*, the supreme court held that the filing of a complaint for administrative review by a nonattorney officer on behalf of a corporation did not render the action a nullity. In that case, a corporation's nonattorney president had filed complaints seeking review of judgments rendered against the corporation after administrative hearings found the corporation in violation of City of Chicago ordinances. The corporation's president filed the complaints by "fill[ing] out four blank *pro se* complaints for administrative review" on "preprinted form[s] supplied by the clerk's office." *Id.* ¶ 5. Approximately six months later, but before the City of Chicago had challenged the complaints, an attorney filed appearances on behalf of the corporation. *Id.* ¶¶ 5-6. The circuit court had granted the City's motion to dismiss the complaints based upon the nullity rule. *Id.* ¶ 7. However, the supreme court found that nullification was unduly harsh, since it was "evident

- 10 -

that [the corporation's president] was unaware he could not prepare and sign the complaints on behalf of the corporation," his "participation was minimal" as he simply "filled in a preprinted blank form," and the corporation had "retained counsel prior to any involvement by the City in the case other than having been served." *Id.* ¶ 32. The supreme court reasoned that "the absence of counsel at the threshold stage of the lawsuit–filing the complaint for administrative review–could not have prejudiced the City" and that the corporation's "commencement of the proceedings without the assistance of counsel was essentially inconsequential." *Id*.

¶ 42        On the facts underlying this appeal, we similarly decline to find that the filing of Rohr Burg's complaint by a nonattorney agent was so egregious that it invalidates the subsequent proceedings. Kulbarsh's reply brief on appeal recognizes that our supreme court's decision in *Downtown Disposal* is controlling but argues that Rohr Burg's "prosecution of the Complaint fulfills all of the requirements" to impose nullification under that decision. However, under our analysis of the relevant factors set forth in *Downtown Disposal*, we conclude that nullifying the proceedings here would be an unnecessarily harsh result. First, as to the factor of whether the nonattorney's conduct was done "without knowledge that the action was improper," there is nothing in the record to indicate that Battista, who was acting in his capacity as director of the Rohr Burg Group, knew or should have known that it was improper for him to file the complaint on behalf of Rohr Burg. Indeed, he did so using a form provided to him by the circuit court titled "*Pro Se* Complaint." Nowhere does that form indicate that a corporation cannot proceed as a *pro se* plaintiff, and we will not presume that Battista, a nonattorney, knew that filing the complaint on behalf of Rohr Burg was improper.

¶ 43        Regarding the next *Downtown Disposal* factor, "whether the corporation acted diligently in correcting the mistake by obtaining counsel," we note that Rohr Burg's complaint was filed on October 22, 2010. Although the record does not specify the exact date that Rohr Burg retained Frank Savaiano as its counsel, Savaiano was listed as Rohr Burg's attorney in an order entered December 13, 2010, and is named on Rohr Burg's subsequent court submissions. Thus, at most, Rohr Burg proceeded without counsel for a period of less than two months following the filing of the complaint. Considering that the parties litigated the case for over two additional years before the trial court's April 2013 order granting summary judgment, this relatively brief period does not weigh in favor of the harsh sanction of nullifying the trial court proceedings as to Rohr Burg.

¶ 44        As to the factor of whether the nonattorney's participation was minimal, we acknowledge that Battista did not simply fill out a preprinted form, but drafted a complaint against Kulbarsh and Kulbarsh's prior attorney, Andy Norman, who later was dismissed from the action. Kulbarsh argues that the litigation by Rohr Burg before it retained counsel was "not minimal" with respect to this *Downtown Disposal* factor. Nevertheless, the majority of the litigation occurred with Savaiano acting as Rohr Burg's counsel. Notably, Savaiano drafted Rohr Burg's motions and argument seeking to dismiss Kulbarsh's counterclaims, as well as the motion for summary judgment that resulted in the order at issue in this appeal. As Rohr Burg was represented by counsel for virtually the entire litigation after the pleading stage, the nonattorney's participation was relatively minimal.

¶ 45        Finally, as to the *Downtown Disposal* factor of "prejudice to the opposing party," we do not find that Kulbarsh suffered prejudice as a result of Rohr Burg filing its complaint while unrepresented by counsel. Kulbarsh's reply claims he was prejudiced by being forced to respond to a complaint that "does not state a recognizable cause of action," but Kulbarsh

cannot argue that he was not sufficiently apprised of the nature of Rohr Burg's claim. The complaint signed by Battista clearly states the factual background and the simple basis of Rohr Burg's claims–namely, that Kulbarsh violated the parties' agreement by failing to return the vehicle. We note that Kulbarsh did not file a motion to dismiss the complaint, even after he retained counsel in August 2011. Moreover, there is no indication that Kulbarsh or his counsel ever requested that Rohr Burg's attorney file a new complaint, let alone argue that the proceedings should be nullified. Indeed, Kulbarsh's affirmative defenses and counterclaims indicate that Kulbarsh understood the allegations being made against him. This is further indication that Kulbarsh was not prejudiced in his ability to litigate this dispute. In short, considering the extent to which this action was litigated after Rohr Burg corrected its initial failure to retain counsel, the factors identified by our supreme court weigh against imposing the penalty of nullification here.

¶ 46    As we do not find that the proceedings were nullified by Rohr Burg's failure to use counsel in preparing its complaint, we turn to the merits of the underlying order. We apply the *de novo* standard of review to a trial court order granting summary judgment. *Inter-Rail Systems, Inc. v. Ravi Corp.*, 387 Ill. App. 3d 510, 515 (2008). " 'Summary judgment is proper if, and only if, the pleadings, depositions, admissions, affidavits and other relevant matters on file show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.' " *Id.* at 515-16 (quoting *Prowell v. Loretto Hospital*, 339 Ill. App. 3d 817, 822 (2003)). "In determining whether a genuine issue of material fact exists, the pleadings, admissions and affidavits are construed strictly against the movant and liberally in favor of the nonmovant." *Inter-Rail Systems*, 387 Ill. App. 3d at 516. " 'A triable issue precluding summary judgment exists where the material facts are disputed or reasonable persons might draw different conclusions from undisputed facts.' " *Id.* (quoting *Prowell*, 339 Ill. App. 3d at 822).

¶ 47    We first address Kulbarsh's argument that the release of claims in the General Release was not enforceable due to lack of consideration. "A release is the abandonment of a claim to the person against whom the claim exists." (Internal quotation marks omitted.) *Borsellino v. Putnam*, 2011 IL App (1st) 102242, ¶ 103. "It is a contract and is therefore governed by contract law." *Id.* "The construction of a contract presents a question of law," for which our standard of review is *de novo*. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). "The primary objective in construing a contract is to give effect to the intent of the parties." *Id.* at 232. "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent. [Citations.] Moreover, *** a contract must be construed as a whole ***. [Citation.] The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.* at 232-33.

¶ 48    As with any contract, " '[a] release must be based upon consideration which consists either of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss of responsibility given, suffered or undertaken by another.' " *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 93 (1999) (quoting *Gavery v. McMahon & Elliott*, 283 Ill. App. 3d 484, 489 (1996)). "Any act or promise that is a benefit to one party or a detriment to the other is a sufficient consideration to support a contract." *Hurd*, 303 Ill. App. 3d at 93. Although some consideration is necessary, " '[a] court's inquiry into whether a contract is supported by consideration does not extend to examining the adequacy of the consideration.' " *Id.* (quoting *Gavery*, 283 Ill. App. 3d at 490). "It is not [the] court's function to review the

- 12 -

amount of consideration unless the amount is so grossly inadequate as to shock the conscience," and thus "[m]ere inadequacy of consideration, in the absence of fraud or unconscionable advantage, ordinarily is insufficient to justify setting aside a contract." (Internal quotation marks omitted.) *Hurd*, 303 Ill. App. 3d at 93.

¶ 49    It is well settled that valid consideration exists for a release when a party promises not to file suit against another party in exchange for payment. See *American National Trust Co. v. Kentucky Fried Chicken of Southern California, Inc.*, 308 Ill. App. 3d 106, 120 (1999) (rejecting argument that defendant "did not provide sufficient, separate consideration for the release" where stipulation provided that appellant "received more tha[n] $64,000 as consideration in exchange for releasing" claims); *Hurd*, 303 Ill. App. 3d at 93 (finding "adequate consideration" where plaintiff, "by signing the release *** obligated himself to never file suit against [defendant] in exchange for thousands of dollars in benefits he was not entitled to"). Here, we agree with the trial court that the release of claims set forth in the General Release was supported by consideration consisting of the refund of the purchase price paid by Kulbarsh and rescission of the purchase contract. Kulbarsh argues that the refund and rescission referenced in the General Release related only to Kulbarsh's agreement to return the vehicle, and did not additionally constitute consideration for his release of claims against Rohr Burg. Kulbarsh's appellate brief argues that "there was no consideration paid to Kulbarsh to give up any *claims*," as the "money he was offered matched the price that he paid for the Vehicle, with interest paid." We do not find this argument persuasive. Kulbarsh's argument suggests that because the cash amount in the General Release was based on the purchase price of the vehicle, it cannot serve as consideration to support any obligation from Kulbarsh beyond his agreement to return the vehicle. To the extent Kulbarsh argues that the purchase price was an inadequate amount of consideration to support both Kulbarsh's agreement to return the vehicle and his obligations under the release, we note that it is not a reviewing court's role to assess whether the amount of consideration was adequate. See *Hurd*, 303 Ill. App. 3d at 93.

¶ 50    Alternatively, Kulbarsh's position appears to be that the parties intended for the refund and rescission of the purchase to serve as consideration only for Kulbarsh's agreement to return the vehicle, and that the parties could not have intended for the repayment and rescission to represent consideration for Kulbarsh's release of claims against Rohr Burg. Our review of the General Release, however, leads us to the opposite conclusion. There is no indication in the contract's language that the refund and rescission of the purchase are intended to serve as consideration *only* for the return of the vehicle. To the contrary, the General Release ties the payment of consideration to Kulbarsh's release of claims. The agreement states that Kulbarsh "hereby accept[s] $21802.00, the repurchase amount and rescission of the contract, due to my concerns associated with the fact of a possible frame damage reported on an Autocheck Report of said vehicle," and the very next sentence states that Kulbarsh "release[s], and forever discharge[s] Rohr-burg Motors *** from any and all obligations of any kind and nature that [Kulbarsh] may have against said Rohr-burg Motors." Construing these provisions together with the contract as a whole, we find the agreement evidences the parties' intention that the payment of $21,802 to Kulbarsh and the rescission of the original purchase served as consideration for his release of claims.[5]

---

[5]Although resort to extrinsic evidence is not necessary to support our conclusion, our view is consistent with the fact that Kulbarsh, who was represented by counsel at the time he signed the

- 13 -

¶ 51    We recognize Kulbarsh's anger and feelings of having been the victim of dishonest treatment by Rohr Burg. Understandably, he sought to fight back in a manner he thought appropriate for the initial wrong that had been done to him. However, procedural and substantive rules which govern resolution of a dispute such as this are not based on emotion. So while we may empathize with the outrage which Kulbarsh experienced as a consumer at the hands of Rohr Burg, such empathy cannot influence resolution of the legal issues in the case.

¶ 52    Similarly, we reject Kulbarsh's argument that the release language was insufficiently specific to bar Kulbarsh's asserted claims against Rohr Burg. Kulbarsh's appellate briefs rely on case law supporting the premise that courts "restrict the language of a general release to the thing or things intended to be released" such that "[g]eneral words of release are inapplicable to unknown claims." This principle is correct, but under these facts does not serve to invalidate the release at issue here, which expressly contemplated the sort of claims asserted by Kulbarsh.

¶ 53    We recognize that a release applies to claims intended to be released, but that "a release will not be construed to include claims that were not within the contemplation of the parties." *Goodman v. Hanson*, 408 Ill. App. 3d 285, 292 (2011). Thus the mere fact that a document is titled a "general release" does not automatically constitute a valid release as to all unanticipated claims. See *Gallagher*, 226 Ill. 2d at 236 (noting that " 'general release' is a conclusory term, and determining whether particular language constitutes a general release is entirely a matter of construing that language"). Thus, "[i]f a release is a general release and the releasing party was unaware of other claims, the release is restricted to the specific claims contained in the release agreement." *Goodman*, 408 Ill. App. 3d at 293. On the other hand, "[w]here both parties were aware of an additional claim at the time of signing the release, the general release will be interpreted to release that claim as well." *Id.*

¶ 54    Applying these principles here, the language of the General Release indicates that the parties were aware of potential claims by Kulbarsh regarding the alleged damage to the vehicle and intended for such claims to be released. We note that the sentence in which Kulbarsh "release[s] and discharge[s]" Rohr Burg is immediately preceded by the statement that Kulbarsh "accept[s] *** the repurchase amount and rescission of the contract, *due to my concerns associated with the fact of a possible frame damage reported on an Autocheck Report of said vehicle*" (emphasis added). From this language, it is apparent that the parties executed the General Release in contemplation of claims related to the existence of such damage. Thus, we reject the suggestion that the counterclaims asserted by Kulbarsh–which are premised on allegations regarding such vehicle damage–were unknown when the parties executed the release. To the contrary, the General Release makes clear that such claims were specifically contemplated and encompassed by the release.

¶ 55    Moreover, we note that even if the release here was initially unenforceable, Kulbarsh's retention of the payment made to him under the General Release independently ratified that release. " 'If a releasor *** retains the consideration after learning that the release is voidable, *** continued retention of the benefits constitutes a ratification of the release.' " *Hurd*, 303 Ill. App. 3d at 93 (quoting *Seward v. B.O.C. Division of General Motors Corp.*, 805 F. Supp. 623, 632 (N.D. Ill. 1992)); see also *Golden v. McDermott, Will & Emery*, 299 Ill. App. 3d 982, 993

---

General Release, admitted at his deposition that he understood that he was "waiving any and all claims that [he] may have in regards to the 2010 Mustang that [he] had purchased from Schaumburg Ford" when he signed the document.

(1998) ("the retention of the consideration by one sui juris, with knowledge of the facts will amount to a ratification of a release executed by him in settlement of a claim, where the retention is for an unreasonable time under the circumstances of the case" (internal quotation marks omitted)). Thus, even assuming *arguendo* that the release was unenforceable, Kulbarsh ratified the agreement by his subsequent conduct. See *Hurd*, 303 Ill. App. 3d at 94 ("[F]ollowing the execution of the release, plaintiff was compensated ***. *** After accepting this compensation, plaintiff waited close to three years to file suit. As a result, plaintiff ratified the purportedly unenforceable release."). In this case, it is not disputed that the check to Kulbarsh cleared within a day or two following execution of the General Release on September 9, 2010, and that American Eagle Bank notified Kulbarsh by letter dated September 13, 2010 that Rohr Burg had satisfied its loan. Kulbarsh admittedly retained the proceeds from the refund check. Thus, even if we concluded that the release was voidable, we would find that Kulbarsh ratified the release by his retention of the consideration for his promise not to sue.

¶ 56     We also reject Kulbarsh's argument that the General Release precluded Rohr Burg from suing Kulbarsh for his failure to return the vehicle. Kulbarsh's argument is premised upon the portion of the General Release stating that "[t]he Undersigned intends hereby to release all unknown and unanticipated claims, if any." Kulbarsh contends that since Sabzali signed the General Release, the "Undersigned" includes Rohr Burg as well as Kulbarsh, and thus Rohr Burg also released its right to assert claims against Kulbarsh. This argument is untenable. Although "the Undersigned" is not explicitly defined in the General Release, construing the contract as a whole it is clear that Kulbarsh is intended as the releasing party. Prior to using the term "Undersigned," the General Release recites that "I, Bruce D. Kulbarsh *** do hereby accept *** the purchase amount and rescission of the contract" and "It is also understood that I, Bruce D. Kulbarsh do hereby acknowledge, remise, release and forever discharge [Rohr Burg] *** from any and all obligation of any kind and nature that I may have against [Rohr Burg] ***." In any event, even assuming that Rohr Burg was included in the definition of "Undersigned," this would not preclude Rohr Burg from suing to enforce the parties' obligations under release. As the trial court recognized, a party to a release "can sue on a release." Under Kulbarsh's logic, neither party could sue to enforce the very contract containing the release. Such an interpretation is illogical, as it would render the document unenforceable. The trial court correctly recognized that Rohr Burg sued to enforce the General Release since Kulbarsh had failed to return the vehicle. We agree with the trial court and reject the suggestion that the General Release precluded Rohr Burg from suing Kulbarsh for his breach of the same agreement.

¶ 57     Kulbarsh's next argument on appeal is that, even assuming the release was initially valid, it was voided by Rohr Burg's failure to deliver a negotiable check. Kulbarsh contends that this failure, together with Rohr Burg's conduct in driving Kulbarsh back from the bank and allowing him to retake possession of the vehicle, voided Kulbarsh's obligations under the General Release. Kulbarsh's appellate briefing cites case law supporting the principle that where a party has materially breached a contract, he cannot recover damages from the other party to the contract. The key term here is "material." That is, "[u]nder general contract principles, only a material breach of a contract provision by one party will justify nonperformance by the other." *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 346 (2005). "The test of whether a breach is 'material' is whether it is 'so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the

failure to perform renders performance of the rest of the contract different in substance from the original agreement.' [Citation.] 'The breach must be so material and important to justify the injured party in regarding the whole transaction at an end.' " *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 43 (quoting *Village of Fox Lake v. Aetna Casualty & Surety Co.*, 178 Ill. App. 3d 887, 900-01 (1989)). "The issue of whether a material breach of contract has been committed is a question of fact, and the trial court's judgment will not be disturbed unless it is against the manifest weight of the evidence." *InsureOne*, 2012 IL App (1st) 092385, ¶ 43.

¶ 58 Here, even assuming the truth of Kulbarsh's testimony that the initial check did not clear and that he did not receive funds until a day or two afterward, the trial court could certainly find that this minor delay would not constitute a material breach that would void Kulbarsh's obligations under the General Release. Although the parties dispute whether Rohr Burg initially issued a nonnegotiable check to Kulbarsh, there is no dispute that Kulbarsh received the funds due to him within a few days after execution of the General Release. In his deposition, Kulbarsh recalled that, after Chase bank initially told him the check was denied for nonsufficient funds, he returned either the next day or a "couple days" later, at which time the check cleared. Kulbarsh's fourth affirmative defense also concedes that Rohr Burg's "checks cleared; that is, [Kulbarsh's] loan to the bank had been repaid and the Rohr Burg check made payable to [Kulbarsh] for the funds that he had used to buy the vehicle had cleared."

¶ 59 In light of Kulbarsh's admission that he received the full monetary consideration called for by the General Release within a short time period, any initial failure to provide a negotiable check would not constitute a material breach that would invalidate Kulbarsh's obligations under the release. A slight delay of payment due under a contract that does not specify a time for payment will not constitute a material breach that excuses nonperformance by the other party. See, *e.g.*, *Midwest Television, Inc. v. Oloffson*, 298 Ill. App. 3d 548, 558 (1998) (employer's late payment of bonuses under contract did not support former employee's affirmative defense of unclean hands, as "[m]inor delays in such payments do not constitute substantial nonperformance and a material breach of the contract"); *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 460 (1995) (lender's delays in funding borrower's requests for disbursement did not constitute material breach of loan agreement, as it was "uncontroverted that each of these requests was ultimately funded" and thus the "delays would constitute, at most, a partial breach of the loan agreement"). Thus, we agree with the trial court that, as there was no dispute that the check at issue "did clear within the week," the question of whether Rohr Burg's initial check was negotiable did not present an issue of material fact precluding summary judgment. Moreover, contrary to Kulbarsh's assertion that the parties treated the General Release as "null and void" after issuance of a nonnegotiable check, we again note that Kulbarsh's retention of the funds served to ratify, rather than undermine, the General Release. See *Golden*, 299 Ill. App. 3d at 993.

¶ 60 Having concluded that the release barred Kulbarsh's counterclaims, we turn to that portion of the order that granted summary judgment with respect to the first four affirmative defenses asserted by Kulbarsh in response to Rohr Burg's complaint. The first three affirmative defenses at issue allege fraud, misrepresentation, and breach of the General Release. These three defenses rely on the same premise: that because the initial refund check was denied for nonsufficient funds, Kulbarsh's obligation to return the vehicle under the General Release was voided. The first two affirmative defenses, fraud and misrepresentation, consist of identical

allegations that "Rohr Burg misrepresented a material fact in that it stated that it was giving [Kulbarsh] a check that was negotiable" and that the check "failed to clear because there were nonsufficient funds in the account." The third affirmative defense claims that "Rohr Burg breached the [General Release] by failing to give [Kulbarsh] a check that was negotiable." Thus, the first three affirmative defenses argue that Kulbarsh's obligation to return the car was voided by Rohr Burg's alleged initial failure to provide a negotiable check.

¶ 61    This argument fails since, as discussed above in the context of enforcement of the release, the admissions and pleadings establish that any such breach was not sufficiently material to excuse Kulbarsh's nonperformance. Kulbarsh admitted that he received payment, at the latest, a "couple days" after the allegedly invalid check, and such a slight delay does not constitute a material breach that excuses Kulbarsh from his obligations under the General Release. Just as the alleged minor delay in payment did not invalidate Kulbarsh's release of claims, it also does not serve as an affirmative defense invalidating his additional obligation under the same contract to return the vehicle. As such, the first three affirmative defenses were properly dismissed by the trial court.

¶ 62    Finally, the fourth affirmative defense asserted by Kulbarsh consists of statements that "[a]fter the written contract was voided" by the nonnegotiable check, Rohr Burg submitted checks that "cleared," such that Kulbarsh's "loan to the bank had been repaid, and the Rohr Burg check made payable to [Kulbarsh] for the funds that he had used to buy the vehicle had cleared." This affirmative defense states that after these payments, "title to the vehicle was sent by [American Eagle] Bank to Rohr Burg, and thereafter [Kulbarsh] *** returned the vehicle." These contentions do not constitute an affirmative defense to Kulbarsh's obligation to return the vehicle, but rather amount to a denial of the complaint's allegation that Kulbarsh wrongfully retained the vehicle after receiving payment.

¶ 63    "The test for whether a defense is an affirmative defense is whether the defense gives color to the opposing party's claim and then asserts [a] new matter by which the apparent right is defeated." *American Family Mutual Insurance Co. v. Albers*, 407 Ill. App. 3d 569, 573 (2011); *Vanlandingham v. Ivanow*, 246 Ill. App. 3d 348, 357 (1993). Thus, the mere denial of an element of a cause of action, without asserting any new matter, does not constitute an affirmative defense. Our supreme court recognized this in the context of a product liability action, explaining that a denial of the element of proximate cause is not an affirmative defense:

>    "The defendant is not required to plead lack of proximate cause as an affirmative defense, which arises when the defendant concedes the viability of the plaintiff's claim but then asserts a new matter in defense that defeats the plaintiff's apparent right to recover. [Citation.] Consequently, the defense that an allegedly defective product was not the proximate cause of the injury merely denies an element of the plaintiff's case and is not an affirmative defense. A claim of lack of proximate cause neither concedes the truthfulness of the plaintiff's claim nor asserts a new matter to defeat the plaintiff's claim; instead, it attacks the sufficiency of that claim." *Korando v. Uniroyal Goodrich Tire Co.*, 159 Ill. 2d 335, 344 (1994).

¶ 64    Here, the contentions in the fourth affirmative defense do not assert a new matter to defeat Rohr Burg's apparent right to recover. Rather, the statement that Kulbarsh returned the vehicle after receiving payment simply denies Rohr Burg's allegation that Kulbarsh remained in possession of the vehicle after receiving the funds due to him under the General Release. As

this does not constitute a separate affirmative defense, the fourth affirmative defense was also properly dismissed by the trial court.

¶ 65 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 66 Affirmed.